UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TOWNSHIP OF MIDDLETOWN, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

RB GLOBAL, INC.; ROUSE SERVICES LLC; ROUSE ANALYTICS LLC; H&E EQUIPMENT SERVICES, INC.; HERC HOLDINGS INC.; HERC RENTALS INC.; SUNBELT RENTALS, INC.; THE HOME DEPOT, INC.; UNITED RENTALS, INC. and UNITED RENTALS (NORTH AMERICA), INC.,

*Defendants*.

Case No. _________

CLASS ACTION COMPLAINT

JURY TRIAL DEMAND

Plaintiff Township of Middletown ("Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against Defendants RB Global, Inc., Rouse Services LLC and Rouse Analytics LLC (collectively, "Rouse"); H&E Equipment Services, Inc. d/b/a H&E Rentals ("H&E"); HERC Holdings Inc. and HERC Rentals Inc. (together with HERC Holdings Inc., "HERC"); Sunbelt Rentals Inc. ("Sunbelt"); The Home Depot, Inc. ("Home Depot"); United Rentals, Inc. and United Rentals (North America), Inc. (together with United Rentals, Inc., "United") (collectively, the "Rental Defendants," and, together with Rouse, the "Defendants") for violations of the federal antitrust laws in connection with Defendants' conspiracy to fix rental prices in the United States market for construction equipment rentals (the "Relevant Market"). Plaintiff makes the following allegations based upon personal knowledge, as well as upon information and belief and investigation of counsel:

## INTRODUCTION

1. This action arises from a *per se* unlawful conspiracy among the Rental Defendants, which are the largest construction equipment rental companies in the United States, and Rouse, an information services company that provides benchmarking and appraisals to the construction industry, to artificially fix, raise, maintain and/or stabilize rental prices of construction equipment rented in the United States from as early as March 31, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist (the "Class Period").

2. The construction of infrastructure, buildings and dwellings is a key driver of continued economic progress in the United States. Municipalities, construction companies, and others that perform construction projects frequently rely on construction equipment that they rent from construction equipment rental companies, including the Rental Defendants. Renting

construction equipment is typically viewed as more cost effective than purchasing such equipment given that renters do not need to expend costs on purchasing, storing, insuring, and maintaining large equipment, which may have limited utility after a specific construction project is completed.

3. Defendants effectuated their conspiracy through their collective elimination of price competition for rented construction equipment by, among other means: (i) agreeing to supply Rouse with confidential and competitively sensitive internal data, including pricing, utilization rates, inventory levels, and other key metrics in real time to power Rouse's platform; and (ii) delegating what should be independent competitive rental pricing to a common decisionmaker – Rouse.

4. Rouse collects Rental Defendants' and other competing construction equipment rental companies' competitively sensitive data nightly. It then applies a common formula, which considers the data provided, seasonality, and Rouse's view of market conditions, to calculate the Rouse Rental Insights rental price (the "RRI Price") for each piece of construction equipment. The same RRI Price is supplied to each competitor in real time through Rouse's online dashboard.

5. Defendants' unlawful anticompetitive conduct artificially fixed, raised, maintained and/or stabilized rental prices of construction equipment in the United States, causing Plaintiff and members of the Class to pay supracompetitive rental prices for construction equipment. In the absence of Defendants' conspiracy, Plaintiff and members of the class would have paid less to rent construction equipment than they did during the Class Period.

6. Plaintiff, on behalf of itself and other members of the Class, brings this proposed class action on behalf of persons and entities who rented construction equipment from the Rental

Defendants for redress of the injury and damages they suffered and continue to suffer by reason of Defendants' continuing violations of law as well as to restore competition in the Relevant Market.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiff brings this action under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

8. This Court has personal jurisdiction over the Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) because Defendant RB Global, Inc. is headquartered in this District. Additionally, each Defendant transacted business in this District and a substantial portion of the activity at issue in this case occurred in this District. This Court also has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) and 15 U.S.C. § 22, which permit bringing an antitrust lawsuit against any corporation in any district where that corporation may be found or transacts business and allow process in such cases to be served in any district where that corporation may be found.

9. Venue is proper in this District under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §1391(b), (c) and (d), because Defendant RB Global, Inc. is headquartered in this District, one or more Defendants resides in or transacts business in this District (or is licensed to do business in this District) and a substantial portion of the interstate commerce described herein was carried out in this District.

10. Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of construction equipment. Defendants' unlawful, anticompetitive conduct as alleged herein substantially impacts interstate trade and

commerce by harming competition and consumers because it artificially raises rental prices and restricts output of construction equipment rented in the United States, causing injury to Plaintiff and the geographically dispersed members of the Class.

## PARTIES

### A. Plaintiff

11. Plaintiff the Township of Middletown is a municipality located in Monmouth County, New Jersey with its principal office located at 1 Kings Highway, Middletown, New Jersey 07748. Plaintiff rented construction equipment from one or more Defendants for use in public projects for the benefit of its residents during the Class Period. As a result of Defendants' anticompetitive conduct, Plaintiff paid more than it would have paid to rent construction equipment absent Defendants' anticompetitive conduct and was injured as a result of the unlawful conduct alleged herein.

### B. Defendants

12. Defendant RB Global, Inc. ("RB Global") is a publicly traded company listed on the Toronto and New York Stock Exchange. RB Global is legally domiciled in Canada and maintains its U.S. headquarters in Westchester, Illinois.

13. Defendant Rouse Services LLC, a wholly owned subsidiary of RB Global, is a California limited liability company with its principal place of business located in Beverly Hills, California.

14. Defendant Rouse Analytics LLC, a wholly owned subsidiary of RB Global, is a California limited liability company with its principal place of business located in Beverly Hills, California. Defendants RB Global, Rouse Services LLC and Rouse Analytics LLC are collectively referred to herein as "Rouse."

15. Defendant H&E Equipment Services, Inc. d/b/a H&E Rentals ("H&E") was a publicly traded company incorporated in Delaware with a principal place of business located in Baton Rouge, Louisiana. H&E was acquired by Defendant HERC in June 2025. H&E was one of the largest construction equipment rental companies in the United States. H&E used Rouse's benchmarking service during the Class Period.

16. Defendant HERC Rentals Inc. is a Delaware corporation with its principal place of business located in Bonita Springs, Florida. HERC Rentals Inc. is a subsidiary of Defendant HERC Holdings Inc. HERC Rentals Inc. is the third largest construction equipment rental company in the United States.

17. Defendant HERC Holdings Inc. is a Delaware corporation with its principal place of business located in Bonita Springs, Florida. HERC Rentals Inc. and HERC Holdings Inc. are collectively referred to herein as "HERC." HERC used Rouse's benchmarking service during the Class Period.

18. Defendant Sunbelt Rentals, Inc. ("Sunbelt") is a North Carolina corporation with its principal place of business located in Fort Mill, North Carolina. Sunbelt is the second largest construction rental equipment company in the United States. Sunbelt used Rouse's benchmarking service during the Class Period.

19. Defendant The Home Depot, Inc. ("Home Depot") is a Delaware corporation with its principal place of business located in Atlanta, Georgia. Home Depot is the sixth largest construction equipment rental company. Home Depot used Rouse's benchmarking service during the Class Period.

20. Defendant United Rentals, Inc., a public company, is a Delaware corporation with its principal place of business located in Stamford, Connecticut. United is the largest construction equipment rental company in the United States.

21. Defendant United Rentals (North America), Inc., a wholly owned subsidiary of United Rentals, Inc., is a Delaware corporation with its headquarters located in Stamford, Connecticut. United Rentals, Inc. and United Rentals (North America), Inc. are collectively referred to herein as "United." United used Rouse's benchmarking service during the Class Period.

## AGENTS AND CO-CONSPIRATORS

22. Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not those co-conspirators are named as defendants in this Complaint.

23. Whenever references are made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affair.

24. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations and common course of conduct alleged herein.

25. Defendants are also liable for the acts done in furtherance of the alleged conspiracy by companies acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

### A. Background of the Construction Equipment Rental Industry

26. The construction industry is critical to the United States as the development and redevelopment of infrastructure and buildings is a cornerstone to continued economic development. Construction projects occur in a variety of sectors, including the public, residential, commercial and industrial sectors.

27. "Construction equipment," as the term is used in the construction industry and this action, refers to large, heavy equipment and components of such equipment. Construction equipment includes, but is not limited to: (i) digging, excavating and earthmoving equipment (e.g., bulldozers, compact truck loaders, excavators and skid steers); (ii) lifting and material handling equipment (e.g., backhoe loaders, cranes, dump trucks, forklifts, telehandlers and wheel loaders); (iii) aerial work platforms (boom and scissor lifts); (iv) specialized preparation equipment (concrete mixers, drill rigs and trenchers); and (v) electrical support equipment (lighting equipment and power generators).

28. Because types of construction projects vary widely, it is more cost effective for those who perform construction work to rent construction equipment tailored to fit the needs of a specific project as opposed to making expensive purchases of equipment, which may have limited utility after project completion. Renting versus purchasing equipment also alleviates the need for renters to pay for costly storage, insurance and maintenance on large pieces of equipment. Avoiding the long-term commitment of owning a piece of construction equipment also provides construction equipment renters more financial flexibility to allocate resources to other needs, making access to competitively priced construction equipment essential for equipment renters, including Plaintiff and members of the Class.

29. Once highly fragmented, the U.S. construction equipment rental market has become increasingly concentrated, making it the world's most consolidated construction equipment rental market. This is due, in large part, to a series of acquisitions, including by United, which made approximately 300 acquisitions over the past 20 years, and Sunbelt, which made over 100 acquisitions in the past ten years.

30. As of December 2024, the top three rental companies – United, Sunbelt and HERC – controlled approximately one third of the U.S. market. The market became further consolidated when Defendant HERC completed its acquisition of what was the fifth-largest construction equipment rental company, H&E, in June 2025.

31. Prior to using Rouse, construction equipment rental companies priced their construction equipment independently using cost and demand factors. For example, they would calculate the cost of owning and operating construction equipment, including the purchase price, maintenance, and insurance, then add a markup to that cost to set their prices. They would also take inventory and demand into account.

32. Construction equipment rental companies typically implemented independent pricing models with rental rates that were fixed for daily, weekly and monthly rentals. Weekly and monthly rates were typically discounted over the longer rental periods. Prices of rental equipment were historically relatively static with some periods of substantial decline.

33. These historical pricing models changed with the rise of Rouse, which enabled competing construction equipment rental companies to benefit from their use of their competitors' competitively sensitive information to artificially raise rental prices.

**B. Background of Rouse**

34. Rouse began as a construction equipment auction company. In the early 2000s, Rouse transitioned to becoming an information services provider that focused on construction equipment appraisals and fleet valuations.

35. In connection with its work as an information services provider, Rouse built a database of used construction equipment sale prices. Its customers included construction equipment rental companies, among others.

36. In the 2008 to 2009 timeframe, construction equipment rental companies, including Rental Defendants United, HERC and H&E, approached Rouse requesting that it develop a benchmarking service for construction equipment rentals that included rental rates and utilization.

37. In 2010, Dan Kaplan, a former independent consultant to the equipment rental industry and former President and CEO of HERC when it was known as Hertz Equipment, published an article in the industry publication Rental Equipment Register entitled: "The Clock Is Ticking on Rate Discipline." He criticized aggressive rate competition among rental companies following the economic downturn and issued a call to arms on rate discipline in the industry. Mr. Kaplan wrote that: "proper rate management can stop . . . pricing pain that is being felt throughout the industry" at the time and that "the entire industry must accept rate responsibility together."

38. In response, the editor in chief of Rental Equipment Register agreed that equipment rental companies that continually slashed rates and discounted were "selling the industry short."

39. The American Rental Association (the "ARA") is a trade group for the equipment rental industry. Construction equipment rental companies, including the Rental Defendants, are

members of the ARA. These companies take guidance from the ARA on critical topics, including marketing, messaging, price, production and supply.

40. In or around October 2011, the ARA published the ARA Rental Market Metrics in partnership with Rouse, which was considered instrumental in developing the metrics, and other large equipment rental companies. The ARA Rental Market Metrics established first-of-their-kind industry standards for the calculation of key construction equipment rental metrics, including time utilization of equipment, financial utilization, fleet age and rental rate variance.

41. The ARA Rental Market Metrics was written to provide equipment rental competitors with a consistent way of calculating and reporting critical performance measures. The then-CEO of the ARA stated that: “Standardizing the methods equipment rental companies use to calculate performance measures will advance individual businesses and industry performance in a consistent manner.” An ARA Vice President explained that, prior to establishing the metrics, it was not possible for “rental businesses to assess their performance relative to their peers.” The ARA Rental Market Metrics changed that and paved the way for Defendants’ price collusion.

42. By 2011, Rouse began offering its construction equipment rental benchmarking service, which incorporated the ARA Rental Market Metrics, as requested by its customers, including United, HERC and H&E. Rouse’s benchmarking service was originally named Rouse Analytics and was later called Rouse Rental Insights (“RRI”).

43. United, HERC, H&E, and two companies that were later acquired by United (NES Rentals and NEFF Corp.), were among Rouse Analytics’ founding customers. These customers were the first co-conspirators of the conspiracy alleged herein through their use of Rouse’s benchmarking service.

44. By February 2015, Rouse reported that its customer base grew to 52 equipment rental companies. At that time, Rouse's Executive Vice President and Chief Operating Officer stated that "[t]he rapid growth of our Rental Metrics Benchmark Service demonstrates how valuable this information is to rental companies[.]"

45. In 2020, Rouse expanded following its acquisition by Ritchie Bros., the world's largest heavy equipment auctioneer and provider of end-to-end services for buying and selling used heavy equipment, trucks and other assets. The aim of the acquisition was to enhance the data analytics and service offerings available to their customers. In 2023, Ritchie Bros. changed the name of its corporate entity to RB Global, of which Rouse is now a subsidiary.

46. In 2024, a former industry CEO explained that Rouse "essentially standardized a lot of the price competition in the industry" and that, "[s]ince their involvement, rates have significantly increased." He described Rouse as "ubiquitous" in the industry over the three prior years, stating that, "[i]f you're a mid-size or larger company, you're using Rouse."

47. By 2024, over 400 rental equipment companies across North America used RRI, including the top ten rental companies and 70 of the top 100. Rouse's database includes at least 60% of the North American rental equipment market's confidential competitively sensitive information, which in turn utilizes the RRI Price.

48. According to RB Global, Rouse provides customers with actionable rental rate and utilization benchmarking intelligence for the construction equipment rental industry, pulled from over 400 companies globally, to enable its customers to make the "most profitable decisions."

### C. Rental Defendants Implement Their Conspiracy Through the Rouse Platform and RRI Price

49. Through their conspiracy, the Rental Defendants conspired to eliminate price competition for Rental Equipment by: (i) agreeing to supply Rouse with confidential and competitively sensitive internal data, including pricing, utilization rates, inventory levels, and other key metrics in real time to power Rouse's platform; and (ii) delegating what should be independent competitive rental pricing to a common decisionmaker – Rouse.

50. Construction equipment companies, including the Rental Defendants, that participate in the conspiracy agree to provide Rouse with access to their nightly invoice-level transaction data containing confidential and competitively sensitive price data, rent duration, fleet age, and real-time equipment utilization rates, which reflect the volume of their inventory that is in use. Rouse integrates with almost all equipment rental software platforms and can "flip a switch" to turn on a data feed and provide its customers with immediate reporting.

51. Rouse data engineers then standardize data consistent with the ARA Rental Market Metrics established by Rouse and ARA and pool that data with other cartel members' data. Rouse then sets the RRI Price for construction rental equipment using a common formula, which takes into account the data collected, seasonality, and Rouse's view of market conditions.

52. Rouse reports the RRI Price to members of the conspiracy, including the Rental Defendants, through the Rouse platform. Rouse enables customers to track their performance against the RRI Price to enable them to view how they compare to their customers and encourage them to adjust their prices accordingly. Rouse also provides members of the conspiracy with market share comparisons and a summary of their rental rates compared to the competitors' rates. In addition to rental rates, Rouse reports industry benchmarks for physical utilization, dollar utilization, fleet age and other key performance metrics.

53. Rouse's RRI Prices and online platform are organized by category and class of equipment and include the specific geographic areas where Rouse's customers are located.

54. Rouse's customers receive a high, medium and low RRI Price for each rental and. A rental company would typically pick the high RRI Price when competitors' inventory is low, and the medium or low RRI Price when competitor's inventory is high.

55. Rouse's platform also enables competitors to compare their rental rates per contract length (e.g., daily, weekly or monthly duration) with their competitors' rental rates.

56. The industry publication Rental Equipment Register described how Rouse's customers utilize its platform to instantaneously obtain competitive information:

> So at any moment, if a rental company wants to know how it is doing with 19-foot scissorlifts in Birmingham compared to the competition, or air compressors in Memphis or any piece of equipment in any covered market for any time period, all it takes is a few keystrokes. A company can, also with a few keystrokes, determine how it is faring in physical or dollar utilization, rates, or fleet age compared to its competitors in markets covered by Rouse. It can also determine how it is faring in ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus its competition.

57. In 2024, Rouse's Director of Client Services explained that Rouse collects "all of our clients' private party sales transactions to their customers." He described it as a process by which Rouse "capture[s] nightly fleet snapshots and closed rental transactions directly from everyone's rental software so that we can aggregate and put together a picture or scorecard of how everyone is performing against" their competitors. He touted the value of Rouse's insights to its customers and explained that Rouse collects a significant amount of data and tracks over $100 billion of fleet in cost in North America.

58. He further explained that Rouse "helps out the entire industry really by allowing people to have more visibility into their performance and their market and react and make better

decisions, and then also help train their sales people to . . . not always listen to their customers" which include Plaintiff and members of the Class, and instead "listen to the data[.]"

59. Figure 1 below is a depiction of the Rouse platform. It reflects how a Rouse customer can compare its own current book rate (the blue bars) to the RRI Price (the grey line), the top quartile (the green area above the RRI Price, representing the average on the top 25% of competitors' contracts by rate), and the bottom quartile (the red line). This design, which Rouse says is designed to give customers everything they need to compare their "rate achievement" to their competitors' rates, encourages competitors to perform at or above the RRI Price.

**Figure 1**




60. The Rouse platform also enables Rouse's customers to compare the rates that specific sales representatives are charging relative to the RRI Price and whether they are discounting compared to that price.

61. The Rouse platform is available via a computer and mobile application to enable customers to track pricing in real time. Rouse's customers can also set price alerts on their dashboard.

62. Rouse touts that RRI data, which is "based on actual real rental invoices sent to customers[,]" enables its customers to "to make the best, most profitable decisions."

63. A former construction equipment rental company CEO explained that Rouse helped the industry sacrifice output for profit and avoid a "race to the bottom" during the pandemic by keeping rental rates high even if equipment went unused.

64. The use of Rouse by construction equipment rental competitors, including the Rental Defendants, is ubiquitous. They use the RRI Price to set their rental prices and rarely deviate from it. It has been alleged that cartel members set prices at the RRI price approximately 90% of the time.

65. After one rental company joined Rouse and attempted to use the RRI Price to offer lower rental prices to its customers and undercut competitors in an effort to rent its new fleet, it caused "annoyance among larger and regional rental companies," which chose not to compete with the new company's lower rates.

66. The President and CEO of United explained that "Rouse has been an important partner for United Rentals, and the broader equipment rental industry, helping us leverage critical data to make better tactical and strategic decisions."

67. The former President and CEO of H&E applauded Rouse for providing "accurate, actionable data . . . with a sense of urgency[.]"

68. A Sunbelt executive explained that Sunbelt leverages rouse in multiple ways, with rate and utilization being the most important, and explained that "the most valuable thing Rouse

helps us with understanding where we sit in the marketplace" in addition to "whether we are overperforming or underperforming to allow us to make adjustments."

69. Rouse touts that it collects information nightly from a vast network of rental companies and tracks $115 billion in equipment fleet.

70. Through Rouse, instead of competing on rental prices for their construction equipment, the Rental Defendants eliminated price competition by collectively supplying their confidential and competitively sensitive internal data to Rouse and delegating their pricing decisions to Rouse.

71. Comments by industry participants confirm that, with the involvement of Rouse, the industry became more disciplined on pricing and that they were able to increase rental prices because of Rouse.

72. For example, in H&E's first-quarter 2022 earnings call, its CEO stated that "I think our pricing is right in line with any of the other firms doing high-quality business . . . . We use a lot of information that's supported by Rouse, not just anecdotal feedback, and we are very comfortable that our pricing is well aligned. And I would comment that the amount of discipline we continue to see, particularly among most of our larger public peers, is very encouraging. I think this is a disciplined environment, and we are all looking to pass on any potential cost increases to the end user and I suspect that's going to happen across the board."

73. At a Goldman Sachs conference in May 2023, the HERC CFO stated that, "[y]ou have sort of 50% to 60% of North American rental companies reporting into Rouse . . . and that certainly goes to the discipline in the overall marketplace in the industry that Larry [Silber, HERC CEO] was speaking of. I think it's invaluable."

74. In early 2024, a former industry CEO stated that, since Rouse became involved in the industry, "rates have significantly increased."

75. Similarly, in September 2024, United's CEO hailed the pricing discipline that Rouse enforced within the construction equipment rental industry, stating that "[t]he industry is so much more disciplined" and that "Rouse analytics has been part of it. We have data now that helps."

76. In December 2024, Chief Executive of Sunbelt's parent company, Ashtead Group, stated during an earnings call: "Importantly, rental rates have continued to progress year-on-year, doing so despite industry utilization levels still lagging highs reached in previous years . . . . This is again affirmation of the ongoing good rate discipline in the industry as a result of the ever-clear structural progression that we've experienced over the years."

### D. Prices Increased and Output Decreased as a Result of Defendants' Anticompetitive Scheme

77. Defendants' anticompetitive scheme caused anticompetitive effects of increased prices and reduced output. Renters of construction equipment could not seek more reasonably priced alternatives and paid more for construction equipment than they would have paid absent Defendants' anticompetitive conduct alleged herein.

78. Prices increased drastically during the Class Period, as reflected in Figure 2 below, which contains the Federal Reserve Economic Data (FRED) Producer Price Index for Construction Equipment Rental and Leasing.

**Figure 2**




79. As prices increased, output decreased. As Ashtead Group's Chief Executive stated, "rental rates have continued to progress year-on-year, doing so despite industry utilization levels still lagging[.]" At the same time, industry revenues climbed, as demonstrated in Figure 3 below.

**Figure 3**



### E. “Plus Factors” Provide Additional Evidence of Defendants’ Conspiracy

80. Plaintiff alleges direct evidence herein of Defendants’ unlawful conspiracy, including the Rental Defendants’ agreements to supply Rouse with confidential competitively sensitive information and their collective use of the RRI Price. Nevertheless, to the extent necessary, Plaintiff also identifies additional “plus factors,” which render the industry susceptible to collusion and support the inference of a conspiracy among Defendants. These plus factors include: (i) a highly concentrated market; (ii) high barriers to entry; (iii) abrupt and parallel change in behavior; (iv) conduct by cartel members that was contrary to their self-interest; and (v) opportunities to collude.

81. A highly concentrated market is more susceptible to collusion. The U.S. construction equipment rental market is highly concentrated. The ten largest companies, all of which are Rouse customers, dominate the market.

82. A company entering the construction equipment rental market faces high barriers to entry. Significant capital is required to purchase storage space and purchase and maintain multiple different types of large, expensive equipment.

83. The construction equipment rental industry experienced an abrupt and parallel change in behavior by industry participants. Previously, construction equipment rental companies priced their construction equipment independently using cost and demand factors. Prior to the establishing the ARA Rental Market Metrics in partnership with Rouse and introduction of the Rouse platform, it was not possible for “rental businesses to assess their performance relative to their peers[,]” according to an ARA Vice President.

84. Rouse Analytics (and later RII) grew from a mere five founding companies in 2011 to over 400 rental equipment company customers across North America by 2024, including the top ten companies and 70 of the top 100.

85. Defendants also acted contrary to their self-interest. In a truly competitive market, construction equipment rental companies, including the Rental Defendants, would keep their competitively sensitive information, including rental pricing and utilization, closely guarded. It would be contrary to their economic self-interest to disclose such information because competitors could utilize that information to undercut their prices to gain customers and increase their market share.

86. Thus, Rental Defendants would not share their confidential competitively sensitive information with Rouse, a third party, unless each Rental Defendant knew that its competitors also agreed to share such information with Rouse and maintain supracompetitive prices.

87. Defendants had multiple opportunities to collude, including through the ARA. Each Rental Defendant is a member of the ARA, which holds multiple industry events that provide Defendants opportunities to collude. The ARA and Rouse are also closely intertwined. The ARA worked with Rouse to develop the ARA Rental Market Metrics and Rouse launched its service in cooperation with the ARA.

## RELEVANT MARKET

88. Insofar as Plaintiff is required to plead the relevant product and geographic markets to establish antitrust standing for the violations alleged herein, Plaintiff alleges the Relevant Market at issue and how Defendants' conduct harmed competitive processes in this market.

89. *Relevant Geographic Market.* The relevant geographic market is the rental market for construction equipment in the United States.

90. *Relevant Product Market.* The relevant product market is the rental market for construction equipment. Specifically, construction equipment includes large, heavy equipment

and components of such equipment, including but not limited to: (i) digging, excavating and earthmoving equipment (e.g., bulldozers, compact truck loaders, excavators and skid steers); (ii) lifting and material handling equipment (e.g., backhoe loaders, cranes, dump trucks, forklifts, telehandlers and wheel loaders); (iii) aerial work platforms (boom and scissor lifts); (iv) specialized preparation equipment (concrete mixers, drill rigs and trenchers); and (v) electrical support equipment (lighting equipment and power generators).

91. Construction equipment cannot be reasonably replaced or substituted with a similar product. Because there are no substitutes, the demand for rental equipment is relatively inelastic – that is, customers do not (and cannot) refrain from renting construction equipment when prices rise (even substantially).

92. *Market Power.* The Relevant Market is highly concentrated. The top three participants in the Relevant Market, United, Sunbelt and HERC, have a combined market share in excess of 33%. Additionally, according to executives at Rouse, the companies using RRI make up at least 60% of the North American construction equipment rental market.

93. *Hypothetical Monopoly Test.* The Relevant Market satisfies the test for market definition used by the federal antitrust enforcement agencies known as the "SSNIP test." The test asks whether a hypothetical monopolist in a market could profitably impose a small but significant (typically 5%) non-transitory increase in price (a "SSNIP"), without causing a significant number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If not, the market is too narrowly defined and it does not encompass sufficient economic substitutes.

94. Here, the SSNIP test is satisfied, and the market is properly defined. As described both above and below, the Rental Defendants and their competitors (with the assistance of Rouse) have been able to increase the rental prices of construction equipment exponentially over the Class Period.

95. Yet, despite these unnatural price increases, construction equipment rental companies have not lost market share. The reason for this is simple: construction equipment rental companies collectively make more money when they neutralize price competition and coordinate pricing. Through the coordination of this pricing using Rouse's tools, Rental Defendants can artificially fix, raise, maintain and/or stabilize the rental price of construction equipment rented in the United States.

## ANTITRUST INJURY

96. Defendants' anticompetitive conduct had the following effects, among others: (i) price competition has been restrained or eliminated with respect to construction equipment; (ii) the rental prices of construction equipment have been fixed, raised, maintained and/or stabilized at artificially inflated levels; (iii) those who rented construction equipment directly from the Rental Defendants have been deprived of free, fair and open competition; (iv) output of construction equipment decreased; and (v) those who rented construction equipment directly from the Rental Defendants paid artificially inflated rental prices.

97. As a direct and foreseeable result of Defendants' conduct, Plaintiff and Class members paid supracompetitive rental prices for construction equipment during the Class Period.

98. By reason of the violations of the antitrust laws alleged herein, Plaintiff and Class members have sustained injury to their business or property, having paid higher or supracompetitive prices for Rental Equipment than they would have paid in the absence of

Defendants' unlawful contract, combination or conspiracy. As a result, Plaintiff and Class members have suffered damages.

99. This is the type of antitrust injury that the antitrust laws were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

## CLASS ACTION ALLEGATIONS

100. Plaintiff brings this action for damages and injunctive relief on behalf of itself and a Class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), with the Class initially defined to include:

> All persons and entities in the United States and its territories that rented construction equipment from a Rental Defendant from March 31, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

101. The following are excluded from the Class: (i) Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates; (ii) federal and state governmental entities, except for cities, towns, counties or other municipalities that rented construction equipment; (iii) counsel of record; and (iv) all judges assigned to hear any aspect of this litigation as well as their immediate family members.

102. *Numerosity.* Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants or others. Plaintiff believes that, due to the nature of the trade and commerce involved, there are hundreds of thousands of Class members geographically dispersed throughout the United States, such that joinder is impracticable.

103. *Typicality.* Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the anticompetitive conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' unlawful

conduct. Plaintiff is advancing the same claims and legal theories on behalf of itself and all other Class members, such that there are no defenses unique to Plaintiff. The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

104. *Commonality.* There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

i. Whether Defendants and their co-conspirators entered into in a contract, combination or conspiracy to fix, raise, maintain and/or stabilize rental prices of construction equipment rented in interstate commerce in the United States;

ii. The duration of the conspiracy or agreement alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

iii. Whether the conspiracy violated the federal antitrust laws;

iv. Whether Plaintiff and members of the Class were harmed;

v. Whether Plaintiff and members of the class are entitled to declaratory relief and injunctive relief to end Defendants' conduct; and

vi. The appropriate class-wide measure of damages as well as whether Plaintiff and Class members are entitled to such damages and other relief.

105. These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

106. *Adequacy of Representation.* Plaintiff will fairly and adequately represent and protect the interests of the Class members. Plaintiff's interests are not antagonistic to those of the other members of the Class. Plaintiff has retained counsel experienced in antitrust class action

litigation, including in the construction industry, and Plaintiff intends to prosecute this action vigorously.

107. *Superiority of Class Action.* This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation.

108. There will be no material difficulty in the management of this action as a class action. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

109. Adequate notice can be given to Class members directly using information maintained in the parties' records.

## FIRST CAUSE OF ACTION
**Violation of Section 1 of the Sherman Act**
**(15 U.S.C. § 1)**

110. Plaintiff realleges and repeats the allegations set forth in paragraphs 1-109 above as if fully set forth herein.

111. From at least March 31, 2021, until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination or conspiracy to unreasonably restrain trade in violation of the Sherman Act.

112. Defendants did this by artificially restraining competition with respect to the price of construction equipment rented within the United States.

113. Defendants' contract, combination or conspiracy caused Plaintiff and Class members to suffer overcharge damages.

114. Defendants' contract, combination or conspiracy is *per se* unlawful. In the alternative, Defendants' conspiracy is unlawful under a "quick look" or rule of reason analysis.

115. There are no procompetitive justifications for Defendants' anticompetitive conduct, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

116. Defendants' conduct caused Plaintiff and Class members to pay supracompetitive rental prices for construction equipment rented in the United States.

117. Defendants' conduct has a substantial effect on interstate commerce.

118. Plaintiff and the Class have suffered and will continue to suffer the type of injury that the antitrust laws were intended to prevent. Plaintiff and the Class have also been harmed by loss of competition in the Relevant Market due to Defendants' conduct.

119. Plaintiff seeks all available damages, injunctive relief, a declaratory judgment as well as costs and attorneys' fees, with respect to this cause of action.

## SECOND CAUSE OF ACTION
### Unlawful Information Exchange
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

120. Plaintiff realleges and repeats the allegations set forth in paragraphs 1-109 above as if fully set forth herein.

121. Beginning at a time currently unknown to Plaintiff, but as late as March 31, 2021, and continuing through the present day, Defendants and their co-conspirators entered into continuing agreement to regularly exchange detailed, timely, competitively sensitive information which is non-public and is about their operations. This agreement is an unreasonable restraint of trade in the Relevant Market under Section 1 of the Sherman Act, 15 U.S.C. § 1.

122. The information regularly exchanged by Defendants pursuant to the agreement has consisted and does consist of information about pricing and utilization of construction equipment. Defendants' regular information exchanges through Rouse's software platform, including Rouse's RRI Price, constitute concerted action between horizontal competitors in the

Relevant Market. Indeed, each Rental Defendant furnished competitively sensitive information with the understanding it would be reciprocated. Rouse enforced this understanding by requiring Rental Defendants to share data in order to receive comparable data.

123. The agreement to regularly exchange this confidential and competitively sensitive information through Rouse about price and supply suppressed competition between the Defendants and could not have been done without the assistance of Rouse.

124. Accordingly, Defendants used the data obtained through Rouse to reduce the uncertainty that they would have individually faced from not knowing what rental prices their competitors were charging for construction equipment. This strategic information was a material factor in the decisions to inflate prices that Plaintiff and members of the Class paid for construction equipment during the Class Period.

125. Defendants' unlawful agreements to exchange, and the actual decision to exchange, this data was not reasonably necessary to further any procompetitive purpose. The information exchange has had the effect of (1) reducing and suppressing competition among Defendants and (2) inflating the rental prices of construction equipment during the Class Period.

126. As a result of this conduct, Plaintiff and Class members have been injured in their business or property by paying artificially inflated prices for construction equipment during the Class Period.

127. Plaintiff and Class members are threatened with future injury to their business and property by reason of Defendants' continuing violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

128. Plaintiff and Class Members are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## PETITION FOR RELIEF

129. Plaintiff petitions for the Court to enter judgment on its behalf and on behalf of the Class defined herein adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiff serving as the Class Representative and its counsel serving as Class Counsel;

B. Defendants have contracted, combined or conspired in violation of the Sherman Act;

C. Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

D. Plaintiff and the Class are entitled to recover three-fold damages, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

E. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded to them, and that such interest be awarded at the highest legal rate;

F. Plaintiff and the Class are entitled to equitable relief suitable to remedy Defendants' past and ongoing restraint of trade, including:

G. A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants;

H. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other

persons acting or claiming to act on their behalf from violations of the law as alleged herein.

I. Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class members;

J. Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

K. Plaintiff and the Class receive such other or further relief as may be just and proper.

**JURY TRIAL DEMANDED**

130. Plaintiff demands a trial by jury on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: August 27, 2025

Respectfully submitted,

By: */s/ Michelle C. Clerkin*
Michelle C. Clerkin
**SPIRO HARRISON & NELSON**
1111 Lincoln Road, Suite 500
Miami Beach, FL 33139
Tel.: (786) 730-2090
Fac.: (973) 232-0887
mclerkin@shnlegal.com

Blake Hunter Yagman
**SPIRO HARRISON & NELSON**
40 Exchange Place, Suite 1100
New York, NY 10005
Tel.: (202) 557-1221
Fac.: (973) 232-0887
byagman@shnlegal.com

*Counsel for Plaintiff and the Proposed Class*